CASE NUMBER 15-12352-A

───────────────

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

───────────────

**ANTONIO JAMES JIMENEZ,**

**Appellant,**

**-vs.-**

**GOVERNMENT EMPLOYEES INSURANCE COMPANY,**

**Appellee.**

───────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
LT CASE NO.: 6:10-cv-640-Orl-37KRS

───────────────────────────

ANSWER BRIEF OF APPELLEE, GOVERNMENT EMPLOYEES
INSURANCE COMPANY

─────────────────────────

B. RICHARD YOUNG
Florida Bar No.: 442682
MEGAN M. HALL
Florida Bar No.: 41695
Young, Bill, Boles, Palmer & Duke, P.A.
Post Office Drawer 1070
Pensacola, FL 32591-1070
Telephone: (850) 432-2222
Facsimile: (850) 432-1444
Attorneys for Appellee GEICO

*Jimenez v. GEICO*
CASE NO.: 15-12352-A

## <u>GOVERNMENT EMPLOYEES INSURANCE COMPANY'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Appellee, GOVERNMENT EMPLOYEES INSURANCE COMPANY ("GEICO"), pursuant to 11th Cir. R. 26.1-2(c), hereby lists the following corporations and interested parties, which were omitted from Appellant's Certificate of Interested Persons and Corporate Disclosure Statement:

Berkshire Hathaway, Inc., BRK-A, BRK-B (stock ticker symbol omitted from Appellant's Certificate): owner of GEICO

Hall, Megan M., Esq. – appellate counsel for GEICO

## STATEMENT REGARDING ORAL ARGUMENT

GEICO respectfully submits that oral argument is not necessary in the present case. GEICO believes that the record speaks for itself and that this Court will be able to reach its decision based upon the record. Contrary to JIMENEZ's assertion, the law pertaining to the enforceability of *Coblentz* agreements[1] is well settled and can be applied by this Court without the benefit of oral argument. Furthermore, the record speaks for itself regarding the evidence presented at trial in support of GEICO's defense.

---

[1]

As will be explained in GEICO's argument, such agreements are referred to as *Coblentz* agreements pursuant to *Coblentz v. American Sur. Co. of New York*, 416 F.2d 1059 (5th Cir. 1969).

i

# TABLE OF CONTENTS

Page

GEICO's Certificate of Interested Persons and Corporate

Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .C 1 of 1

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of Subject-Matter and Appellate Jurisdiction . . . . . . . . . . . . . . . . . . vii

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    I.     Nature of the case, course of proceedings, and disposition in the court

         below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.    Statement of the Material Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

    III.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         A.    Judgment as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . .17

         B.    Motion for a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.     *Coblentz* Agreements under Florida Law . . . . . . . . . . . . . . . . . . . . . 21

    II.    JIMENEZ cannot prevail on appeal because there was sufficient

evidence for the jury to find that the Coblentz Agreement was unreasonable in amount or tainted by bad faith, fraud, or collusion or without any effort to minimize liability. . . . . . . . . . . . . . . . . . . . . . . . . 25

III.    JIMENEZ has failed to establish that the trial court abused its discretion in denying his Motion for New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Argument and Citations of Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF CITATIONS

Cases                                                                Page

*Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663 (M.D. Fla. 2010) . . . . . . . . . . . . . . .24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . 18

*Bond Safeguard Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2014

      WL 5325728 (M.D. Fla. Oct. 20, 2014) . . . . . . . . . . . . . . . . . . . . . . . .22, 23, 24

*Bradfield v. Mid-Continent Cas. Co.*, 15 F.Supp.3d 1253 (M.D. Fla. 2014) . . . . . 21

*Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co., a div. of Paccar,*

      *Inc.*, 781 F.2d 1520 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Christopher v. Florida*, 449 F.3d 1360 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . .18

*Chomat v. N. Ins. Co. of N.Y.,* 919 So. 2d 535 (Fla. 3d DCA 2006) . . . . . . . . . .41, 44

*Coblentz v. Am. Surety Co. of New York*, 416 F.2d 1059 (5th Cir. 1969). . . . . .*passim*

*Collins v. Marriott Intern., Inc.*, 749 F.3d 951 (11th Cir. 2014) . . . . . . . . . . . . . . 17

*Continental Cas. Co. v. Hempel,* 4 Fed.Appx. 703 (10th Cir. 2001) . . . . . . . . .42, 43

*Corwin v. Walt Disney Co.*, 475 F.3d 1239 (11th Cir. 2007) . . . . . . . . . . . . . . . .41

*Crist v. Dickson Welding, Inc.,* 957 F. 2d 1281 (5th Cir. 1992) . . . . . . . . . . . . . . . 50

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232 (11th Cir. 2001) . . . . . . . . . . . 17

*Elmer and HTH, Inc. v. ICC Fabricating, Inc., et al.*, 67 F.3d 1571

(Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Harrington v. Richter*, 562 U.S. 86 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Home Ins. Co. v. Advance Machine Co.,* 443 So. 2d 165 (Fla. 1st DCA1983). . 23, 24

*MidContinent Cas. Co. v. Am. Pride Bldg. Co., LLC,* 534 F. App'x 926

    (11th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 45, 46

*Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174

    (Fla. 4th DCA 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 47

*Olin v. Demings*, 2014 WL 117081 (M.D. Fla. 2014) . . . . . . . . . . . . . . . . . . . . .41

*One Hour Air Conditioning Franchising, LLC v. Dallas Unique,* 2015 WL

    5316866 (M.D. Fla. September 11, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

 *Quintana v. Barad,* 528 So. 2d 1300 (Fla. 3d DCA 1988) . . . . . . . . . . . . . . . . 44, 47

*Richards v. Michelin Tire Corp.,* 21 F.3d 1048 (11th Cir. 1994) . . . . . . . . . . . 45, 50

*Royal Typewriter Co., a Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies*

    *Corp.,* 719 F. 2d 1092 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Sargent v. Johnson,* 551 F. 2d 221 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 42

*Scott Bridge Co, Inc. v. Gresham Smith and Partners,* 2015 WL 5996206,

    (M.D. Ala. October 14, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Steil v. Florida Physicians' Ins. v. Reciprocal*, 448 So. 2d 589

    (Fla. 2d DCA 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 44, 47

*U.S. v. Brown*, 53 F.3d 312 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.*, 930 So. 2d 686

    (Fla. 4th DCA 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Watts v. Great Atlantic and Pacific Tea Co., Inc.*, 842 F.2d 307

    (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. City of Valdosta*, 689 F.2d 964 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . 19

*Wrangen v. Pa. Lumbermans Mut. Ins. Co.*, 593 F.Supp.2d 1273

    (S.D. Fla. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


**Statutes and Other Authorities**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .vi

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Florida Statute § 627.428 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 42, 43

Florida Statute § 768.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Florida Statute § 768.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11th Circuit Pattern Jury Instruction 1.1 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The United States District Court for the Middle District of Florida properly exercised jurisdiction over the action filed by ANTONIO JAMES JIMENEZ against GOVERNMENT EMPLOYEES INSURANCE COMPANY, Case Number 6:10-cv-640-Orl-35KRS, pursuant to 28 U.S.C. § 1332 because there was complete diversity of citizenship between the plaintiff and the defendant, and because the amount in controversy exceeded $75,000.

This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1291, "Final Decisions of District Courts," because the district court entered final judgment in GEICO's favor on December 11, 2014.  [*See* Doc. 130, Judgment in a Civil Case.]  JIMENEZ filed his Notice of Appeal on May 26, 2015, which was within thirty days of the date on which the district court entered its Order denying JIMENEZ's Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial .  [*See* Docs. 138, 145, 148.]

## STATEMENT OF THE ISSUES

The issues presented in this appeal are whether GEICO presented sufficient evidence at trial upon which the jury could rely in finding that the *Coblentz* Agreement entered into by JIMENEZ and the Estate of Pinedo was not reasonable in amount, or was entered into as a result of bad faith, fraud, or collusion, or without any effort to minimize liability. In addition, this Court will be asked to decide whether the trial court abused its discretion in declining to order a new trial based on the language of the second question presented to the jury.

## STATEMENT OF THE CASE

### I.    Nature of the Case, Course of Proceedings, and Disposition in the Court Below

The present appeal stems from a third party bad faith action and disputed *Coblentz* Agreement ("the *Coblentz* Agreement") brought by ANTONIO JAMES JIMENEZ ("JIMENEZ") against GOVERNMENT EMPLOYEES INSURANCE COMPANY ("GEICO") in the United States District Court for the Middle District of Florida, Orlando Division, on or about April 23, 2010. [*See* Doc. 1.] The action proceeded to trial, resulting in a jury verdict on two issues. [*See* Doc. 129.] The first question, to which the jury responded in the affirmative, asked as follows:

> Do you find by a preponderance of the evidence that GOVERNMENT EMPLOYEES INSURANCE

1

> COMPANY acted in bad faith by failing to settle the Pablo Pinedo wrongful death claim against its insured, ANTONIO JAMES JIMENEZ?

[Doc. 129 at p. 1.]   The second question, which the jury answered in the negative, presented the following inquiry:

> Do you find that the consent judgment entered into by Antonio James Jimenez was reasonable in amount and not tainted by bad faith, fraud, or collusion or without any effort to minimize liability?

[Doc. 129 at p. 2.]

The trial court entered Final Judgment in favor of GEICO and against JIMENEZ on December 11, 2014.  [*See* Doc. 130.]  On January 8, 2015, after trial and entry of judgment, JIMENEZ filed a Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a New Trial ("Motion for Judgment"), which the trial court denied in an Order dated April 28, 2015.  [*See* Docs. 138, 145.] In denying JIMENEZ's Motion for Judgment, the district court found that the record contained evidentiary support for the jury's findings and stated that it would not second-guess the jury or substitute its judgment for the jury's.  [*See* Doc. 145 at pg 7.] Furthermore, the district court found that JIMENEZ failed to establish entitlement to a new trial.  [*See* Doc 145 at pg 8.]   While JIMENEZ argued that the jury interrogatory number two was improper and violated the "two issue rule," the district

court denied JIMENEZ's request for a new trial because this Court has specifically validated the exact language used for the special verdict form interrogatory presented to the jury. [*See* Doc. 145 at pg 8.] On May 26, 2015, JIMENEZ appealed the Final Judgment entered in GEICO's favor, as well as the trial court's April 28, 2015 Order denying JIMENEZ's Motion for Judgment. [*See* Doc. 148.]

## II.    Statement of the Material Facts

GEICO issued policy number 4012-43-17-73 ("the Policy") to Marlyn Santiago for the term of March 3, 2006 through September 3, 2006. [*See* Doc. 1-2.] The Policy provided Bodily Injury ("BI") coverage in the amount of $10,000 per person and $20,000 per occurrence. [*See id.* at pg 5.] The insurance application listed Marlyn Santiago as the policy holder and JIMENEZ as an insured driver. [*See id.* at pg 28.] A 1997 Honda Accord LX was listed as a covered vehicle, with JIMENEZ as the registered owner. [*See id.* at pg 29.]

On the morning of March 4, 2006, at approximately 1:49 a.m., JIMENEZ was driving his 1997 Honda when he was involved in a multi-vehicle accident ("the accident"). [*See* Doc. 69-2, GLC 03670-03673.] The accident occurred on Interstate 4 in Orange County, Florida, when JIMENEZ's vehicle struck a vehicle operated by Pedro Ortega ("Ortega") from behind, causing Ortega's vehicle to cross from the westbound direction into eastbound Interstate 4. [*See id.* at GLC 03673.] After

3

crossing over into eastbound traffic, Ortega's vehicle collided head-on with a vehicle operated by Ada Farley. [*See id*. at GLC 03673.] At the time of the accident, John Farley and Pablo Pinedo ("Pinedo") were passengers in the Farley vehicle. [*See id*. at GLC 03672.] Ada Farley and Pinedo were pronounced as fatalities at the scene of the accident, and Ortega and John Farley were sent to Orlando Regional Medical Center ("ORMC") for medical treatment. [*See id*. at GLC 03672.] JIMENEZ fled the scene of the accident. [*See id*. at GLC 03672.]

JIMENEZ represented that his 1997 Honda had been stolen, and filed a written report attesting to such with the Orlando Police Department ("OPD") at approximately 2:45 p.m. on the day of the accident. [*See* Doc. 69-3 at GLC 05249-05250, GLC 04538-04541.] Santiago reported the theft of JIMENEZ's vehicle to GEICO on March 4, 2006 at approximately 4:02 p.m., advising GEICO that the theft had been reported to the OPD, that the keys were unaccounted for, and that she was not aware of the identity of the thief. [*See* Doc. 70-1 at GLC 001036.] GEICO began its investigation of the accident the same day that it was reported to the company. [*See id*.]

GEICO requested a copy of the theft and accident reports from the OPD on March 10, 2006 and March 13, 2006, respectively. [*See id*. at GLC 001033,

001035.]² GEICO learned on March 10ᵗʰ that Ortega was represented by an attorney, whose office advised GEICO that JIMENEZ's vehicle was involved in an accident that resulted in the deaths of Ada Farley and Pinedo and bodily injuries to Ortega and John Farley. [*See id*. at GLC 001034-001035.] According to "Danny" with the attorney's office, Ortega was admitted to the hospital, underwent surgery on his foot, and was expected to be out of work for six months at a minimum. [*See id.* at GLC 001034.]

On March 14, 2006, GEICO obtained a statement from JIMENEZ, via recorded interview, at which time JIMENEZ stated that he became aware of his vehicle's absence on the morning of March 4, 2006 and subsequently reported it stolen. [*See* Doc. 69-6 at GLC 0017.] JIMENEZ informed GEICO that, to his knowledge, he only had one set of keys and that he normally locked the doors of the vehicle; however, in this instance, he may have left the keys in the door or in the trunk. [*See id*.] JIMENEZ further advised GEICO that the vehicle had been involved in an accident that resulted in two deaths, but maintained that he was the victim of theft. [*See id*. at 0018.] JIMENEZ also verified his address was 5785 Gatlin Ave., Apt. #711, Orlando, FL 32822 and acknowledged that his statements were true and correct to the

---

² GEICO received a copy of the accident report on March 16, 2006 and added the report to the claim file. [*See* Doc. 70-1, at 001032.]

5

best of his knowledge. [*See* Doc. 69-6 at GLC 0016; GLC 0020.] JIMENEZ further advised GEICO that on the night of March 3, 2006, he resided in a gated apartment complex that maintained security guards who patrolled the premises. [*See* Doc. 70-1 at GLC 001033.]

On March 20, 2006, JIMENEZ notified GEICO that he had retained an attorney to represent him. [*See* Doc. 70-1 at GLC 001032.] He also advised GEICO that he and the named insured (Santiago) were divorced, but that he kept his vehicle on her policy. [*See id.*] On March 21, 2006, GEICO sent JIMENEZ a Reservation of Rights ("ROR") letter, advising JIMENEZ that coverage may not apply for the accident because ". . . the driver of the vehicle may not be an insured under the policy as defined in Section I Liability Coverages- Person Insured." [*See* Doc. 69-7 at GLC 05358.]

On March 23, 2006, GEICO was advised by attorney Jim Clark ("Clark") that he represented John Farley and Ada Farley ("the Farleys"). [*See* Doc. 70-1 at GLC 001031.] Clark informed GEICO that the Farleys had lost Ada in the accident and that John had sustained a fracture to his arm and femur with internal fixation, a crushed ankle, and other injuries. [*See id.* at GLC 001031.]

On April 12, 2006, GEICO received a time limited demand from attorney Glenn Klausman ("Klausman"), who represented Pedro Ortega, demanding the BI

6

policy limits by May 5, 2006.  [*See* Doc. 69-8 at G-CVG 03233-03244.] Klausman represented that Ortega, a driver for Mears Destination Services, Inc., had been unable to work since the accident.  [*See id*.]

On April 17, 2006, a GEICO home office attorney, Mike Gilliom ("Gilliom"), discussed the coverage question and the facts of the accident with Lisa DePoy (DePoy), a GEICO adjuster.  [*See* Doc 70-1 at GLC 001027-001028.]  Gilliom gave DePoy authority in the amount of the $20,000 policy limits to settle all BI claims, stating that the JIMENEZ vehicle had been operated with a key.  [*See id*. at GLC 001027.]  Gilliom instructed DePoy to retain an attorney to represent JIMENEZ and to set up a global settlement conference to settle the claims. [*See id*. at GLC 001026-001027.]

The same day, GEICO advised JIMENEZ that Klausman had made a demand on behalf of Ortega, that GEICO would be setting up a global settlement conference in an effort to resolve the claims, and that GEICO had hired John Golding ("Golding") to represent JIMENEZ in the global settlement.  [*See* Doc. 69-9 at GLC 02426, 02422.] GEICO also informed JIMENEZ of the following: 1) that GEICO would defend any lawsuit filed against him relating to the accident; 2) that there existed a possibility for an excess judgment; and 3) that JIMENEZ had a right to obtain outside counsel and personally contribute to the settlement.  [*See id*. at 02422].

7

In addition, GEICO sent letters to Klausman, Clark, and the Family of Pinedo[3], advising that GEICO was arranging a global settlement conference in hopes of settling all claims against Santiago and JIMENEZ.  [*See* Doc. 69-10 at G-CVG 03226-03227; *see also* Doc. 69-11 at GLC 02678-02679; *see also* Doc. 69-12 at GLC 02697-02698.]  JIMENEZ was copied on these letters.  [*See id.*]

On April 27, 2006, DePoy responded to Klausman's demand for Ortega by advising that GEICO could neither accept nor reject the demand because GEICO was coordinating a global settlement conference to address all claims regarding the accident, and GEICO hoped to address the resolution of Ortega's BI claim at the conference. [*See* Doc. 69-15.]  JIMENEZ was copied on this letter, as well. [*See id.*]  Via correspondence dated May 5, 2006, Golding's office notified GEICO that Klausman, on behalf of Ortega, and Clark, on behalf of the Farleys, agreed to attend a global settlement conference. [*See* Doc. 69-16.]

A GEICO field representative ascertained on or about May 11, 2006 that Pinedo had a six month old child who lived with the child's mother in Uruguay. [*See* Doc. 70-1 at GLC 001024.]  GEICO learned on May 16, 2006 that the Pinedo family

---

[3] GEICO sent the Pinedo letter to the address that was listed on the accident report. [*See* Doc. 69-2 at 03670.]  Golding also sent a letter to the Family of Pinedo, advising the family of the other claimants and the global settlement conference.  [*See* Doc. 69-14, 0005275.]

had retained attorney William McBride ("McBride"), who DePoy attempted to contact the same day. [*See id*. at GLC 001023.] DePoy requested a return call and letter of representation. [*See id*.] DePoy advised Golding and JIMENEZ that GEICO had located the individual with authority to handle the Pinedo claim, and provided McBride's contact information. [*See* Doc. 69-19.]

On May 18, 2006, DePoy sent McBride a letter, which was copied to JIMENEZ, advising that GEICO was setting up a global settlement conference in an attempt to settle all claims against JIMENEZ. [*See* Doc. 69-20.] DePoy requested that McBride contact Golding so that a convenient date and time could be arranged for the conference. [*See id*.] That same day, attorney Tammy Cicchetti ("Cicchetti") sent a letter to Glenn Klausman, Jim Clark, Tim Hartung, John Golding, and the family of Pinedo, advising that she was retained by GEICO to set up a global settlement conference to try and reach a fair resolution of the claims. [*See* Doc. 69-21.] Cicchetti acknowledged that the $10,000/$20,000 BI policy limits were insufficient to compensate any one of the injured parties. [*See id.* at GLC 02754.] Cicchetti suggested possible mediators and dates for the conference and requested that the parties advise regarding their availability. [*See id*. at GLC 02755.] Cicchetti also reached out to McBride to advise him of the global settlement conference and request his participation on behalf of Pinedo. [*See* Doc. 69-22 at GLC 02753.]

9

On May 31, 2006, Cicchetti advised Klausman, Clark, Hartung, Golding, and attorney Mike Romano ("Romano")[4] that the global settlement conference call was scheduled for June 26, 2006. [*See* Doc. 69-23.][5]. On June 23, 2006, Clark advised Cicchetti that he no longer represented the Farleys and was not attending the conference. [*See* Doc. 69-24.] Cicchetti requested that Clark advise Mr. Farley of the conference. [*See id.*]

On June 26, 2006, Cicchetti held the global settlement conference call, to which Klausman, Golding and Romano were in attendance. [*See* Doc. 69-25.] No one attended the conference on behalf of the Farleys or Pinedo. [*See id*. at GLC 02734.] Cicchetti attempted to reach a settlement agreement for the policy limits with Klausman on behalf of Ortega during the conference and by correspondence. [*See id*.; *see also* Doc. 69-26.] Klausman rejected the settlement offer both during the conference call and afterwards through correspondence. [*See* Doc. 69-29.][6] On June

---

[4]

Mr. Romano served as counsel for Ortega's insurer, Progressive, for the global settlement conference.

[5]

This letter was copied to the family of Pinedo. [*See* Doc. 69-23.] On or about May 31, 2006, Cicchetti was advised that McBride no longer represented Pinedo. [*See* Doc. 69-28.]

[6]

Thereafter, Cicchetti tendered the $10,000 BI policy limits to Klausman, which was again rejected. [*See* Doc. 69-26 at GLC 02730; *see also* Doc. 69-29.]

28, 2006, JIMENEZ was advised that the global settlement conference was unsuccessful and that suit may be filed against him relating to the accident. [*See* Doc. 69-25; *see also* Doc. 69-26; *see also* Doc. 69-30; *see also* Doc. 70-1 at GLC 001021.]

On July 20, 2006, DePoy advised JIMENEZ that GEICO received a copy of a lawsuit filed against JIMENEZ by Ortega and that the defense of same had been referred to the law firm of Ringer, Henry, Buckley & Seacord ("Ringer Henry"). [*See* Doc. 69-27.] Attorney Scharome Deaton ("Deaton") of Ringer Henry defended JIMENEZ in the Ortega litigation. JIMENEZ maintained that his vehicle had been stolen and that he was not involved in the accident throughout the Ortega litigation. [*See* Doc. 69-31.] Thereafter, Cicchetti attempted to schedule a second global settlement conference. [*See* Doc. 69-32 at G-CVG 02280-02281; GLC 02094; G-CVG 01957-01958.] JIMENEZ was advised of the attempts to coordinate a second global settlement conference. [*See id*.]

On October 3, 2006, Deaton informed GEICO that JIMENEZ had formally been charged with eight (8) criminal counts relating to the accident, including two (2) counts of vehicular homicide, two (2) counts for leaving the scene of the accident, two (2) counts for filing false police reports, and two (2) counts for making false statements. [*See* Doc. 70-1 at GLC 001017.] JIMENEZ subsequently pled guilty in the criminal matter to leaving the scene of an accident involving a death and failing

11

to render aid; JIMENEZ was scheduled for sentencing on May 18, 2007[7]. [*See* Doc. 69-34.] On the same day, DePoy sent JIMENEZ a second ROR, advising JIMENEZ that coverage may not apply for the accident due to his fraud and material misrepresentations in reporting the theft of his vehicle and the accident. [*See* Doc. 69-35.]

GEICO advised JIMENEZ that his actions in pleading guilty to the criminal charges were not expected based on JIMENEZ's prior statements and testimony in the civil litigation. [*See id*. at G-CVG 01011.] GEICO stated that "[c]overage is not provided to any person who knowingly conceals or misrepresents any material fact or circumstance relating to this insurance: 1) at any time during the policy period; or 2) in connection with the presentation or settlement of a claim." [*See id*. at G-CVG 01011.] On or about April 13, 2007, GEICO decided to file a declaratory judgment action to determine coverage based on JIMENEZ's fraud and material misrepresentations in reporting the theft of his vehicle and the accident. [*See* Doc. 69-38.]

On May 2, 2007, GEICO received a letter of representation dated April 23,

---

[7]

On May 21, 2007, GEICO was advised that JIMENEZ admitted at his sentencing hearing that he was driving the vehicle in the accident and lied in his prior statements and depositions, and that JIMENEZ was sentenced to ten (10) years in prison. [*See* Doc. 70-1 at GLC 001009.]

2007 from attorney James O. Cunningham ("Cunningham"), advising that he represented Aldina Alarcon Lopez, guardian of Guillermo Alarcon ("Alarcon"), a minor, who was the surviving child of Pinedo. [*See* Doc. 69-39.] DePoy requested that Deaton represent JIMENEZ against any claim on behalf of Guillermo Alarcon arising from the accident. [*See* Doc. 69-40.] On May 15, 2007, Deaton advised Cunningham that she represented JIMENEZ, that GEICO had reserved coverage defenses, and requested documentation clarifying the relationship between Alarcon and Pinedo. [*See* Doc. 69-43.] On May 25, 2007, Cunningham provided a DNA test report confirming the paternity of Pinedo. [*See* Doc. 69-44.]

On or about June 26, 2007, GEICO filed a declaratory judgment action against JIMENEZ, Ortega, the Estate of Pinedo, John Farley, and the Estate of Ada Farley. [*See* Doc. 69-41.] Therein, GEICO asserted that the claims relating to the accident were not covered under the Policy, due primarily to JIMENEZ's material misrepresentations and false statements made to GEICO. [*See id.*]

On July 9, 2007, Cunningham made a demand for payment of the full $10,000 BI policy limits within twenty (20) days. [*See* Doc. 69-42 at GLC 04955.] Deaton forwarded the demand to JIMENEZ and DePoy on July 11, 2007. [*See id.* at GLC 04954.] On July 23, 2007, DePoy advised Deaton that due to the pending declaratory judgment action and the multiple claims, GEICO was not going to make a payment

on any demand until the coverage issue was resolved by the court.  [*See* Doc. 69-45 at Ringer 0010; *see also* Doc. 69-46; *see also* Doc. 70-1 at GLC 001007.]  On July 30, 2007, Deaton sent Cunningham a letter stating that "[a]t this time, neither GEICO nor Mr. Jimenez has authorized me to settle this matter."  [*See* Doc. 69-47.]

On February 14, 2008, attorney Rick Martindale ("Martindale"), on behalf of JIMENEZ, forwarded DePoy a copy of a lawsuit filed against JIMENEZ by Cunningham on behalf of the Estate and survivors of Pinedo.  [*See* Doc. 69-48.] Martindale advised that he accepted service on behalf of JIMENEZ and was tendering the defense and indemnification of the lawsuit to GEICO.  [*See id*. at GLC 05463.] DePoy requested that Deaton proceed to defend JIMENEZ against the Pinedo lawsuit. [*See* Doc. 69-49 at GLC 05462.]  However, on February 29, 2008, attorney Mark Nation ("Nation") advised GEICO that JIMENEZ ". . . hereby rejects the offer of a defense under a reservation of rights" and that JIMENEZ would ". . . seek alternative counsel to represent him" in the Pinedo lawsuit.  [*See* Doc. 69-50; *see also* Doc. 1 at ¶12.]  On July 3, 2008, DePoy wrote Martindale and Nation, expressing concern that neither attorney had entered an appearance on behalf of JIMENEZ in the Pinedo litigation.  [*See* Doc. 69-51.] DePoy again tendered a defense to JIMENEZ under a reservation of rights and urged Martindale and Nation to reconsider their position and accept the defense. [*See id*.]  On July 22, 2008, Nation responded that his February

14

29, 2008 letter ". . . was quite clear in that we were rejecting the defense being offered in the Pinedo matter." [*See* Doc. 69-52.]

On or about December 15, 2009, despite the fact that the Pinedo lawsuit was never actually served upon him, JIMENEZ stipulated to entry of judgment against himself for the wrongful death of Pinedo in the amount of $1,000,000, which would accrue interest at the rate of eleven percent. [*See* Doc. 1-4; *see also* Doc. 142-1 at p. 69, line 24 through p. 70, line 3.] JIMENEZ and Pinedo agreed that Pinedo would not pursue JIMENEZ for the $1,000,000.00 judgment and that JIMENEZ would never be held accountable for the settlement agreement, even if nothing were ever recovered from GEICO. [*See* Doc. 142-1 at pg. 26, line. 4-7 and 16-23.] JIMENEZ acknowledged at trial of the bad faith action that the agreement obligated him not only to make an assignment of rights for the bad faith claim against GEICO, but also that if Pinedo requested that JIMENEZ file a bad faith action against GEICO, JIMENEZ was agreeing to do so to fulfill his end of the agreement and not be held liable for the $1,000,000.00 judgment. [*See id*. at pg. 26, lines 4-7 and 16-23.]

On April 23, 2010, JIMENEZ filed a two-count complaint against GEICO for breach of contract and insurance bad faith. [*See* Doc. 1.] Trial commenced on the bad faith action on December 8, 2014. [*See* Doc. 115.] During trial, JIMENEZ

presented witnesses, such as Mr. Cunningham[8], JIMENEZ, and Mr. deArmas, who testified regarding the reasonableness of the *Coblentz* Agreement. However, upon cross examination of such witnesses, it was revealed that discovery had not been performed in reaching the amount of the Agreement. [*See* Doc. 142-1 at pg 69, line 24 through p. 72, line 1.]

Furthermore, JIMENEZ acknowledged that he had not participated in the negotiation of the $1,000,000.00 settlement amount, and had only agreed to it after the fact. [*See* Doc. 142-1 at pg 25, lines 1 and 6-14.] JIMENEZ also entered into the Agreement knowing that he would never be held personally accountable for the judgment to which he was agreeing. [*See id*. at pg 26, lines 4-7 and 16-23.] Cunningham testified on cross examination that during negotiations of the Agreement, both parties neglected to perform discovery on the affairs of Pinedo to ascertain his actual financial and economic status, or to verify the validity and definite location of Pinedo's heir. [*See* Doc. 141-2 at pp. 69-76.]

After the close of evidence, the jury was presented with a verdict form which posed the following two yes or no questions:

> 1. Do you find by a preponderance of the evidence that GOVERNMENT EMPLOYEES INSURANCE

---

[8]

Mr. Cunningham represented Pinedo in the *Coblentz* settlement agreement negotiations and helped draft the document.

16

COMPANY acted in bad faith by failing to settle the Pablo Pinedo wrongful death claim against its insured, ANTONIO JAMES JIMENEZ?

2.  Do you find that the consent judgment entered into by Antonio James Jimenez was reasonable in amount and not tainted by bad faith, fraud, or collusion or without any effort to minimize liability?

[*See* Doc. 129]. The jury returned a verdict answering YES to the first question and NO to the second question. [*See id*.] Accordingly, the Court entered its Judgment in a Civil Case in favor of GEICO on December 11, 2014.  [*See* Doc. 130.] JIMENEZ filed the post-trial motion described above, and the present appeal followed the trial court's denial thereof.

## III.  Standard of Review

### A.    Judgment as a Matter of Law

When the court of appeals reviews a district court's denial of a party's motion for judgment as a matter of law, that review is performed de novo, and requires the Court to employ the same standards that the trial court was required to apply. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1237 (11th Cir. 2001). The court of appeals, like the district court, must ". . . draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Collins v. Marriott Intern., Inc.*, 749 F.3d 951, 957 (11th Cir. 2014).

17

Further, judgment as a matter of law should only be granted where the evidence, viewed most favorably in light of the non-moving party, is hardly colorable or not significantly probative. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Regardless of the district court's disposition in a case, the court of appeals may not interfere with a jury's factual findings unless the appellant can demonstrate that there was a lack of substantial evidence to support such findings. *See Elmer and HTH, Inc., v. ICC Fabricating, Inc., et al*, 67 F.3d 1571, 1574 (Fed. Cir. 1995). There exists a burden upon the moving party to establish that there is no genuine issue as to any material fact in order for the appellant to be entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[I]f there is substantial conflict in the evidence, such that 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. . . '" then the court must deny the motion for judgment as a matter of law. *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006)

B.    New Trial

In reviewing the district court's ruling on a motion for a new trial, the court of appeals applies the abuse of discretion standard, and may reverse the lower court's disposition only where such abuse is found. *See Watts v. Great Atlantic and Pacific*

18

*Tea Co., Inc.,* 842 F.2d 307, 310-11 (11th Cir. 1988); *Williams v. City of Valdosta*, 689 F.2d 964, 974 (11th Cir. 1982). Although the abuse of discretion standard serves as the basis for the appellate court's review of the district court's ruling on a motion for new trial, where the motion is granted, rather than denied, and where the weight of the evidence is the basis for the motion for new trial, the appellate court must be more rigorous in its review. *See Williams*, 689 F.2d at 974.

In the present matter, JIMENEZ seeks a new trial not on the weight of the evidence presented at trial, but on the basis that the construction of jury question number two was improper in form. Additionally, the trial court denied, rather than granted, the motion. Therefore, in this case, the Court must apply the abuse of discretion standard when analyzing the district court's denial of JIMENEZ's Motion for New Trial.

## SUMMARY OF THE ARGUMENT

The present appeal stems from a bad faith action initiated by JIMENEZ against GEICO, in which the jury was asked to answer two questions. First, the jury was asked to determine whether GEICO acted in bad faith in handling a claim brought by the Estate of Pinedo against JIMENEZ following an automobile accident that took place on March 4, 2006. The jury answered "yes" to this question. However, this was not the end of the inquiry. Because the Estate of Pinedo's action against

JIMENEZ was resolved by agreement between the parties thereto, referred to as a *Coblentz* Agreement, JIMENEZ was required to prove certain elements in order to hold GEICO liable for the amount of the Agreement. Accordingly, the second question on the jury verdict form asked the jury to determine whether the Agreement was reasonable in amount and not tainted by bad faith, fraud, or collusion, or without any effort to minimize liability. The jury answered "no" to the second question; accordingly, the trial court entered judgment in GEICO's favor. It is this issue that JIMENEZ complains about on appeal.

GEICO respectfully requests that this Honorable Court affirm the trial court's findings, as there was sufficient evidence presented to the jury that the Agreement was not reasonable in amount, and that it was tainted by bad faith, fraud, collusion, or without any effort to minimize liability. As explained herein, JIMENEZ, as well as the attorney that represented the Estate of Pinedo and JIMENEZ's expert witness, testified that the parties to the *Coblentz* Agreement engaged in absolutely no discovery or inquiry into the value of the Estate's claim. Instead, the parties chose the one million dollar settlement amount arbitrarily. Furthermore, the jury heard about the fees that would be received by the attorneys for the parties to the Agreement, which would come from the one million dollar settlement amount. For the reasons discussed herein, the jury's finding on question number two was

supported by evidence, and the district court properly denied JIMENEZ's Motion for Judgment as a Matter of Law.

In addition, GEICO requests that this Court reject JIMENEZ's argument that question number two was inherently flawed, warranting a new trial. In reaching its decision on this issue, the trial court properly relied on this Court's analysis in a separate matter of the exact question presented to the jury in this action. In doing so, the district judge in no way abused his discretion. Furthermore, JIMENEZ has failed to establish that the question was confusing, or that it combined a proper question with an improper one. Therefore, this Court should affirm the lower court's denial of JIMENEZ's Motion for New Trial.

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.   *Coblentz* Agreements under Florida Law

"A '*Coblentz* agreement' refers to a negotiated consent judgment 'entered into between an insured and a claimant in order to resolve a lawsuit in which the insurer has denied coverage and declined to defend.'"  *Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So.3d 174, 180 (Fla. 4th DCA 2015)(*quoting Bradfield v. Mid-Continent Cas. Co.*, 15 F.Supp.3d 1253, 1257 n. 6 (M.D.Fla. 2014)); *see also MidContinent Cas. Co. v. Am. Pride Bldg. Co.*, LLC, 534 F. App'x 926, 927 (11th Cir. 2013).  The term "*Coblentz* agreement" is derived from the Fifth Circuit Court

21

of Appeals' decision in *Coblentz v. Am. Surety Co. of New York*, 416 F.2d 1059 (5th Cir. 1969). In addition to establishing liability and fixing damages, entering into a *Coblentz* agreement allows the insured to assign any cause of action that it has against the insurer to the injured party in exchange for a release from personal liability. *See Royal Crane*, 169 So.3d at 180. In order to enforce the agreement, the assignee must bring an action against the insurer and prove the following three elements: "(1) the damages are covered by the policy; (2) the insurer wrongfully refuse[d] to defend; and (3) the settlement is reasonable and made in good faith." *Id*. (*quoting U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.*, 930 So.2d 686, 690-691 (Fla. 4 DCA 2006)).

The purpose of a *Coblentz* agreement is to allow the insured to take reasonable steps to protect himself, which would otherwise be prohibited by the policy, when the insurer wrongfully denies coverage and leaves the insured to his own devices in the face of a likely adverse judgment. *See Bond Safeguard Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2014 WL 5325728, at *9 (M.D. Fla. Oct. 20, 2014). However, *Coblentz* does not ". . . authorize the insured to indiscriminately load the carrier's wagon with bricks of damage that no reasonable person would expect as consequences of the underlying claim." *Id*. The concern in a case involving a *Coblentz* agreement is that the settlement between the insured and the claimant may not represent an arm's length determination of the actual value of the claimant's

22

claim. *See Steil v. Florida Physicians' Ins. v. Reciprocal*, 448 So.2d 589, 592 (Fla. 2d DCA 1984). As stated by Florida's Second DCA, a consent judgment with a covenant not to execute is "more suspect" than a judgment entered after trial or a settlement that the insured actually pays. *See id*. Where the claimant and insured enter into a *Coblentz* agreement, the insured has little or nothing to lose because he will never be required to pay the agreed-to amount. *See id*. Accordingly, Florida courts require that the claimant make a prima facie case of reasonableness and lack of bad faith. *See id*. Courts test the reasonableness of a *Coblentz* agreement by "what a 'prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim.'" *Bond Safeguard Ins. Co.*, 2014 WL 5325728 (*citing Wrangen v. Pa. Lumbermans Mut. Ins. Co.*, 593 F.Supp.2d 1273, 1279 (S.D.Fla. 2008)(*quoting Home Ins. Co. v. Advance Machine Co.,* 443 So.2d 165, 168 (Fla. 1st DCA1983)).

In determining whether a *Coblentz* agreement is reasonable, courts consider both objective and subjective factors, and the reasonableness is often (but not required to be) established through expert testimony concerning the following issues:

> such matters as the extent of the defendant's liability, the reasonableness of the damages amount in comparison with compensatory awards in other cases, and the expense which have been required for the settling defendants to settle the suit. A determination of reasonableness of the settlement agreement is made in view of the degree of probability of the insured's success and the size of the possible recovery.

23

> Bad faith does not require a showing of fraud. Rather, it may be established by evidence of a "false claim, or collusion in which the plaintiffs agree to share the recovery with the insured", or an absence of any "effort to minimize liability."

*Bond Safeguard*, 2014 WL 5325728 at \*9 (internal citations omitted).

In a case involving personal injuries, Florida courts have noted that objective factors include ". . . the extent of plaintiff's injuries, his past, present, and future medical expenses, his age, and his ability to work." *Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 669-670 (M.D. Fla. 2010)(*quoting Home Ins. Co. v. Advance Mach. Co.*, 443 So.2d 165, 168 (Fla. 1st DCA 1983)).  Subjective factors may include the degree of certainty of the insured's liability, the risks attendant to proceeding to trial, and the possibility that the jury may reach a verdict that exceeds the settlement offer.  *See Levesque*, 263 F.R.D. at 670.

It follows that the objective factors to be considered when determining the reasonableness of a *Coblentz* agreement entered in a wrongful death action would be those set forth under the Florida Wrongful Death Act.  *See* FLA.STAT. § 768.21. Under this Act, damages may be awarded to a surviving child for lost support and services. *See id*.  Factors that are considered when computing lost support and services are the survivor's relationship to the decedent, the amount of the decedent's probable net income available for distribution to the particular survivor,   the

24

replacement value of the decedent's services to the survivor, parental companionship, instruction, guidance, and mental pain and suffering from the date of the injury. *See id*. The decedent's personal representative may also recover for the decedent's estate the loss of earnings of the deceased from the date of injury to the date of death, less lost support of survivors, excluding contributions in kind, with interest. *See id*. Loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value, may also be recovered by the decedent's personal representative. *See id*.

Under the Florida Wrongful Death Act, the term "net accumulations" means the part of the decedent's expected net business or salary income, including pension benefits, that the decedent probably would have retained as savings and left as part of his estate if the decedent had lived his normal life expectancy. *See* FLA.STAT. § 768.18. Furthermore, "net business or salary income" refers to the part of the decedent's probable gross income after taxes, excluding income from investments continuing beyond death, that remain after deducting the decedent's personal expenses and support of survivors, excluding contributions in kind. *See id*.

## II. JIMENEZ cannot prevail on appeal because there was sufficient evidence for the jury to find that the *Coblentz* Agreement was unreasonable in amount or tainted by bad faith, fraud, or collusion or without any effort to minimize liability.

JIMENEZ argues on appeal that the district court erred in denying his Motion

25

for Judgment as a Matter of Law because GEICO failed to present affirmative evidence that the *Coblentz* Agreement entered into between JIMENEZ and the Estate of Pinedo was unenforceable. [*See* JIMENEZ's Initial Brief at pp. 30-31.] However, the testimony of the witnesses called by JIMENEZ and GEICO's cross-examination of those witnesses **is evidence**. *See, e.g., U.S. v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995)(stating that substantive evidence is evidence that is presented ". . . for the purpose of proving a fact in issue, as opposed to evidence given for the purpose of discrediting a witness (*i.e.* showing that he is unworthy of belief), or of corroborating his testimony."). Regardless of the party that presents the evidence, or the point in time during the trial that testimony is elicited, the jury is required to consider all of the evidence presented. *See* 11th Circuit Pattern Jury Instruction 1.1 (2013)(stating, "You should base your decision on all the evidence, regardless of which party presented it."). Here, there was more than sufficient evidence for the jury to conclude that the *Coblentz* Agreement entered into between JIMENEZ and the Estate of Pinedo was not reasonable in amount and / or tainted by bad faith, fraud, or collusion or without any effort to minimize liability.

For example, Mr. Jimenez testified as follows during trial:

> Mr. Young: In this agreement, you agreed with the estate of Mr. Pinedo that you would enter into a $1 million consent judgment, didn't you? And I'll direct

26

|                  | you over here to page 2 where I've highlighted it. |
|------------------|----------------------------------------------------|
| Mr. Jimenez:     | Yes, sir.                                          |

[*See* Doc. 142-1 at p. 24, lines 20-25.]

***

|                  |                                                    |
|------------------|----------------------------------------------------|
| Mr. Young:       | Did you pick the number $1 million?                |
| Mr. Jimenez:     | I don't remember how we came up with that number, sir. |
| Mr. Young:       | Okay, but did you personally pick the number?      |
| Mr. Jimenez:     | I signed off on the agreement, yes, sir.           |
| Mr. Young:       | Sir, I'm sorry. Maybe I'm not being clear. Did you decide that was the right number, or did you simply agree to it? |
| Mr. Jimenez:     | I agreed to it.                                    |

[*Id.* at page 25, line 1; 6-14 (objection and ruling omitted).]

***

|                  |                                                    |
|------------------|----------------------------------------------------|
| Mr. Young:       | You understood the day you signed this or inked this document that you would never be held accountable for the judgment you were agreeing to, didn't you? |
| Mr. Jimenez:     | Yes, sir.                                          |

* * *

|                  |                                                    |
|------------------|----------------------------------------------------|
| Mr. Young:       | That means that you agreed, if the estate requested, that you would come in here in front of this jury and sue GEICO for bad faith? |
| Mr. Jimenez:     | Yes, sir.                                          |
| Mr. Young:       | That's what you're doing, isn't it?               |

27

| Mr. Jimenez: | Yes, I am, sir. |
| Mr. Young: | You're filling your end of this agreement, right? |
| Mr. Jimenez: | Yes, I am, sir. |

[*Id*. at page 26, lines 4-7; 16-23.]

JIMENEZ's testimony establishes that he simply agreed to the amount of the *Coblentz* Agreement and took no steps to determine if the amount was reasonable based on the facts and his potential liability to the Pinedo Estate. Based on this, the jury could determine that JIMENEZ made no effort to minimize the liability because he did nothing to determine the amount of damage that he caused to the Estate of Pinedo. Furthermore, JIMENEZ entered into the *Coblentz* Agreement knowing full well that he would never be liable for the amount, as long as he would sue GEICO for bad faith. Accordingly, the jury could determine that the Agreement was tainted by bad faith, fraud, or collusion.

In addition, the testimony of Mr. Cunningham, who represented the Pinedo Estate and stood to gain significant attorneys' fees if the jury found that the *Coblentz* Agreement was enforceable, was sufficient evidence on which the jury could find that the *Coblentz* Agreement was unreasonable in amount and / or tainted by bad faith, fraud, or collusion, or without any effort to minimize liability. Specifically, Mr. Cunningham testified, in relevant part, as follows:

| Mr. Young: | Let's talk a moment about the lawsuit. |

28

|  | I think you told us in response to one of Mr. Nation's questions that you never actually served the lawsuit on Mr. Jimenez, correct? |
| Mr. Cunningham: | I believe that's correct, yes, sir. |
| Mr. Young: | So there was no actual discovery that was conducted, then? |
| Mr. Cunningham: | In this case, there was not. |
| Mr. Young: | And by discovery, so we're all clear, what we mean is you didn't have to produce any documents to Mr. Nation. Mr. Nation didn't produce any documents to you. You didn't ask him any interrogatories or written questions that Mr. Jimenez had to answer. And your client didn't have to answer any. Fair? |
| Mr. Cunningham: | That's fair. |
| Mr. Young: | No depositions were taken? |
| Mr. Cunningham: | There were not. |
| Mr. Young: | So without serving a lawsuit or moving into discovery, you and he entered into this agreement that he just showed you? |
| Mr. Cunningham: | Yes. |
| Mr. Young: | Who drafted it? |
| Mr. Cunningham: | Mr. Nation did. |
| Mr. Young: | Do you see the third page under G of that agreement? |
| Mr. Cunningham: | Yes. |
| Mr. Young: | Does it set forth attorneys' fees and costs in there? |
| Mr. Cunningham: | It seems to. |
| Mr. Young: | What's your percentage? |

* * *

| Mr. Cunningham: | I believe my percentage, if I understand |

29

| | |
|---|---|
| | the document correctly, is one third of what the estate is awarded. |
| Mr. Young: | So you're talking about basically $333,000 and change? |
| Mr. Cunningham: | That's a potentially highest amount that it could be. I believe Mr. Nation had attorneys' fees that he would be entitled to before I would be entitled or my client would be entitled to anything. |
| Mr. Young: | Oh, so you and he would be collecting off of this agreement? |
| Mr. Cunningham: | Potentially, if GEICO was found in bad faith. |
| Mr. Young: | Right. Okay. And that was negotiated and discussed back in September of 2008 when y'all entered into this agreement , wasn't it? |
| Mr. Cunningham: | What was negotiated and discussed? |
| Mr. Young: | The fee split. |
| Mr. Cunningham: | Yes it was. |

[Doc. 142-1 at p. 69, line 24 through p. 72, line 1.].

\*\*\*

| | |
|---|---|
| Mr. Young: | And those life tables are how long we will live for our entire lives, isn't it? |
| Mr. Cunningham: | Yes. |
| Mr. Young: | They're not work life tables, are they? |
| Mr. Cunningham: | They are not. |
| Mr. Young: | So you can't determine the work life of a person just by looking at that life table, can you? |
| Mr. Cunningham: | You can't. |

[*Id*. at page 72, lines 13-20].

\*\*\*

30

| Mr. Young: | In this agreement, the agreement was that Mr. Jimenez would allow a $1 million consent judgment to be taken against him, correct? |
| Mr. Cunningham: | I believe that's correct. |

[*Id.* at page 73, lines 2-5].

***

| Mr. Young: | And in exchange for his agreement to enter into that $1 million consent judgment, your client, if you'll go down to 9-E, said, even though we're going to enter a judgment against you, Mr. Jimenez – and we'll flip over here to the next page – the estate, meaning your client, will not execute or attempt to execute directly against Mr. Jimenez in any attempt to satisfy the judgment. Didn't you? |
| Mr. Cunningham: | Yes. |
| Mr. Young: | And putting that in plain English, it means you're never going to try to collect it from him? |
| Mr. Cunningham: | That's what it means. |
| Mr. Young: | So no matter what happens in this trial, the man who caused the accident and killed your client's significant other is not responsible? |
| Mr. Cunningham: | That's probably true. |

[*Id.* at page 73, lines 9-24].

***

| Mr. Young: | Now, we talked a little bit about – or at least you talked a little bit with Mr. |

31

|                    | Nation about how much Mr. Pinedo was saving. I want to ask you, how much did his tax return show he made per year at the time of his death? |
|--------------------|--------------------------------|
| Mr. Cunningham:    | I don't know.                  |
| Mr. Young:         | Okay. How much was his rent?   |
| Mr. Cunningham:    | I don't know.                  |
| Mr. Young:         | How much did he spend a month in utilities? |
| Mr. Cunningham:    | I don't know.                  |
| Mr. Young:         | How much in food?              |
| Mr. Cunningham:    | I don't know.                  |
| Mr. Young:         | How about entertainment?       |
| Mr. Cunningham:    | I don't know.                  |
| Mr. Young:         | Do you know the source of this money that was in that savings account? |
| Mr. Cunningham:    | As best I can recall, it was – came from wages that he earned working for Five Star Laundry and Orange Lake Resort where he worked two jobs. |
| Mr. Young:         | Well did you do an investigation to trace back the source of that income to verify that? |
| Mr. Cunningham:    | At the time that we entered into the agreement, no, I had not. |
| Mr. Young:         | Okay. Did you hire a life planner to project out his net accumulations or expenses? |
| Mr. Cunningham:    | No. That was one of the expenses that was avoided when the agreement was entered into. |
| Mr. Young:         | You didn't hire an economist either, did you? |
| Mr. Cunningham:    | Did not have to.               |
| Mr. Young:         | How much money was he spending on himself per month? |
| Mr. Cunningham:    | I don't know.                  |
| Mr. Young:         | Did you ever obtain any checkbooks to |

try to determine that?

Mr. Cunningham: I don't recall if I did or not at this point.

Mr. Young: How did he pay for things? Was he a cash guy? Was he a check guy? Debit card?

Mr. Cunningham: I'm not sure.

Mr. Young: Okay. Do you know if he had ever seen his minor child?

Mr. Cunningham: As far as I know, he had not physically seen him?

Mr. Young: When did his girlfriend return to Uruguay?

Mr. Cunningham: I don't know the exact date.

Mr. Young: In order to determine net accumulations for an estate, you need to know how much someone is spending on their personal consumption, don't you?

Mr. Cunningham: That's one of the factors, yes.

[*Id*. at page 73, line 25 through p. 75, line 20].

***

Mr. Young: All right. How much money did he send to Uruguay for the child?

Mr. Cunningham: I'm not sure the exact amount. But I – but I understand that there was money that was being sent.

Mr. Young: But you don't know how much?

Mr. Cunningham: I don't know the exact amount.

[*Id*. at page 76, lines 9-14].

Additionally, the testimony of JIMENEZ's expert, Mr. de Armas, on cross

examination is sufficient evidence for the jury to find that the *Coblentz* Agreement

33

was unreasonable in amount and / or tainted by bad faith, fraud, or collusion or without any effort to minimize liability.  *See, e.g., One Hour Air Conditioning Franchising, LLC v. Dallas Unique*, 2015 WL 5316866, *5 (M.D.Fla. September 11, 2015)(stating that a party may attack expert testimony through vigorous cross-examination); *see also Scott Bridge Co, Inc. v. Gresham Smith and Partners*, 2015 WL 5996206, *8 (M.D.Ala. October 14, 2015).  Specifically, Mr. de Armas testified as follows:

| | |
|---|---|
| Mr. Young: | I'm showing you on the screen Defendant's Exhibit 11, which is the agreement you were just discussing. Do you recall that? |
| Mr. deArmas: | Yes. |
| Mr. Young: | Do you recall just telling the folks on this jury that, absent this clause in here, there would be no way for the attorneys for the estate to get paid –excuse me– the attorneys for the insured, Mr. Jimenez, to get paid.  Do you remember that? |
| Mr. deArmas: | If that's the phrase – I don't think that's the exact phrase I used.  But it would be – this is normal, making sure that the attorney for the insured does get paid. |
| Mr. Young: | Well, let me try to refresh your recollection.  Didn't Mr. Nation just ask you directly, if you didn't have this clause in here, how else would the attorneys for the insured get paid? And you said, well, they wouldn't. |
| Mr. deArmas: | Wouldn't in a case like this because |

|               | Mr. Jimenez doesn't have any money. |
|---------------|-------------------------------------|
| Mr. Young:    | Mr. Jimenez is the insured, is he not? |
| Mr. deArmas:  | Yes.  And if he had money, he could pay him. |
| Mr. Young:    | Are you familiar with Florida law that states that when the insured brings a lawsuit against its own company, that if he prevails, he's entitled to attorneys' fees? |
| Mr. deArmas:  | Section 627.428 says that. |
| Mr. Young:    | You even know the statute. |
| Mr. deArmas:  | It's right here – it refers to it in the last sentence as well. |
| Mr. Young:    | That's right.  And that statute is completely independent of these percentages out of the recovery, isn't it? |
| Mr. deArmas:  | The statute would be independent except that the agreement makes it and they intertwine. |
| Mr. Young:    | The statute would allow those fees on top of the recovery, wouldn't it? |
| Mr. deArmas:  | It would in some cases, but it's not what it is here. |
| Mr. Young:    | Sir, in this case, it allows it on top of the recovery if they prevail, doesn't it? |
| Mr. deArmas:  | The fees are payable to the lawyer if awarded by the Court, certainly.  And the amount, the percentages are going to be reduced by that amount, according to this agreement.  I agree with that. |
| Mr. Young:    | So you think that absent putting percentages in this agreement, that there's no way these gentlemen would get paid if they prevailed? |
| Mr. deArmas:  | I wouldn't say there's no way they could get paid anything.  No, that's not |

35

|               |                                                                                                                                                                                                    |
|---------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|               | true. But if the case were to be settled early, then they would be in a position of not getting paid or not getting paid much.                                                                       |
| Mr. Young:    | So you basically – I want to be real clear on this. You think that 627.428, the statute, and that's the number, would not allow these gentlemen to recover their fees, irrespective of this agreement? |
| Mr. deArmas:  | I would say if the case went to trial and they were entitled to recover fees by having prevailed, a Court could award fees. But that would not take into account a lot of other outcomes that could happen. |
| Mr. Young:    | Yes, sir. But if they prevail, those fees are on top of the award or the consent judgment here, aren't they?                                                                                          |
| Mr. deArmas:  | If they go to trial, then those fees are on top, yes.                                                                                                                                                 |

[Doc. 142-2 at page 69, line 17 through p. 72, line 1.]

***

|               |                                                                                                                    |
|---------------|--------------------------------------------------------------------------------------------------------------------|
| Mr. Young:    | You talked a little bit about the reasonableness of the consent judgment a few moments ago. Do you recall that?      |
| Mr. deArmas:  | Uh-huh.                                                                                                             |
| Mr. Young:    | Did you look at Mr. Pinedo's tax returns?                                                                           |
| Mr. deArmas:  | I did not.                                                                                                          |
| Mr. Young:    | Did you see any evidence of how much he was earning at the time of his death?                                       |
| Mr. deArmas:  | Not of his earnings per se. I looked at his savings, not his earnings.                                              |

36

| | |
|---|---|
| Mr. Young: | Did you see any evidence in the file about how much he was spending on himself on a daily basis, weekly basis, anything like that? |
| Mr. deArmas: | There was an inference on that. But, no, I did not specifically look at that part. I was not doing a full-blown analysis on that. |
| Mr. Young: | Okay. Did you review any canceled checks or other evidence of how much money, if any, he was sending to his girlfriend in Uruguay? |
| Mr. deArmas: | No. |
| Mr. Young: | Do you know if his girlfriend was ever in the U.S. with him? |
| Mr. deArmas: | My understanding is that she was here when she got pregnant. But – |
| Mr. Young: | Do you know how long she was here? |
| Mr. deArmas: | I don't know. |
| Mr. Young: | How long they were together? |
| Mr. deArmas: | I think they were still together when he passed away. |
| Mr. Young: | And my question is, how long total had they been together? |
| Mr. deArmas: | I don't know. |
| Mr. Young: | When did she leave to go back to Uruguay? |
| Mr. deArmas: | Again, that's not my area, so I don't know. |
| Mr. Young: | Was the child born here in the U.S. or in Uruguay? |
| Mr. deArmas: | My understanding is the child was born in Uruguay. |
| Mr. Young: | Did Mr. Pinedo ever meet his child? |
| Mr. deArmas: | He had not yet met his child; but he was looking forward to it, based on what I saw in the file, in GEICO's file. |

37

[Exhibit B at pages 76, line 4 through p. 77, line 17.]

***

| | |
|---|---|
| Mr. Young: | What evidence did you see during that seven-month period that he was sending money to the child? |
| Mr. deArmas: | I already answered that. |
| Mr. Young: | Which was what? |
| Mr. deArmas: | I did not see that he sent any money to the child per se, no. |
| Mr. Young: | And, sir, these things I just covered, they are like A, B, C, simple, when you are evaluating a wrongful death claim, aren't they? These are things you look at? |
| Mr. deArmas: | It's things that when – we look at if there weren't other factors to look at, sure. |

[*Id* at page 78, lines 14-24.]

***

| | |
|---|---|
| Mr. Young: | What evidence did you see to suggest that any of these factors I just covered with you were even contemplated by those lawyers [representing the parties to the *Coblentz* Agreement]? |
| Mr. deArmas: | I don't have any way of knowing what they contemplated. |
| Mr. Young: | Okay.  Do you know if Mr. Pinedo's girlfriend was working at the time of his death? |
| Mr. deArmas: | I don't know. |
| Mr. Young: | Where does she live in Uruguay? |
| Mr. deArmas: | I believe with family, but I don't know that for a fact. |
| Mr. Young: | No. Where? A city? |
| Mr. deArmas: | I don't know. |

38

| Mr. Young: | Do you know if she remarried? Well, excuse me. I'm sorry. Do you know if she got married to anyone else after his death? |
| Mr. deArmas: | I do not know. She didn't have a claim, so I don't know. |

[*Id*. at pages 79, line 9 through p. 80, line 1.]

Accordingly, despite JIMENEZ's contention that GEICO presented no evidence to the jury regarding the reasonableness of the amount of the *Coblentz* Agreement, the jury received ample evidence through testimony by JIMENEZ himself, as well the attorney for the Estate of Pinedo in the underlying matter, and JIMENEZ's own expert that there was no inquiry, investigation or determination whatsoever into the financial condition of Mr. Pinedo at the time that the *Coblentz* Agreement was entered into. Mr. Cunningham acknowledged that in order to determine net accumulations for an estate, one needs to know how much someone is spending on their personal consumption. However, Mr, Cunningham testified that he did nothing to determine the net accumulations for the Pinedo Estate, including, among other things, determining how much Mr. Pinedo was spending on his personal consumption. While JIMENEZ makes much in his Initial Brief of money that Mr. Pinedo had in savings at the time of his death, there was absolutely no inquiry into the source of the funds. JIMENEZ's own expert, Mr. de Armas, acknowledged that these things, conducting inquiry into Mr. Pinedo's finances, conducting discovery in

the underlying case, and having knowledge as to Mr. Pinedo's support for his minor child, are things that are done when evaluating a wrongful death claim.

In short, rather than inquiring into the amount of disposable income that Mr. Pinedo spent on himself, conducting discovery regarding his future earning capacity, exploring the type of relationship that Mr. Pinedo had with his girlfriend and child, inquiring into whether Mr. Pinedo was providing financial support to his child, or determining whether the child was, in fact, growing up without the benefit of a father, the parties to the *Coblentz* Agreement simply chose one million dollars as the settlement value. This was a nice, round number. As demonstrated by the evidence at trial, as long as JIMENEZ was not required to pay the settlement value, he was fine with the number that was chosen. In exchange for the Estate of Pinedo's agreement not to seek to recover the one million dollars from JIMENEZ, JIMENEZ agreed to accuse GEICO of bad faith. JIMENEZ fulfilled his part of the deal. This complete lack of inquiry into the reasonableness of the $1,000,000 settlement amount, based on the facts of the accident and the parties involved, is sufficient evidence upon which the jury made its determination as to question number two.

Throughout JIMENEZ's Initial Brief, he asserts that GEICO was required to provide expert testimony regarding the enforceability of the *Coblentz* Agreement. However, this is not the law. Proof of reasonableness may be established through use

40

of expert testimony, but such testimony is not required. *See Chomat v. N. Ins. Co. Of New York*, 919 So.2d 535, 538 (Fla. 3d DCA 2006); *see also, e.g., Harrington v. Richter*, 562 U.S. 86, 111 (2011)("In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). JIMENEZ argues that GEICO failed to establish that the amount of the *Coblentz* Agreement was unreasonable because GEICO did not present expert testimony on this issue, and points to the opinions of Mr. de Armas and Mr. Cunningham that the amount of the agreement was within the verdict range they would expect. JIMENEZ's argument must be rejected, as expert testimony is not required or appropriate when an issue is within the jury's ordinary knowledge. *See, e.g., Corwin v. Walt Disney Co*., 475 F.3d 1239, 1250 (11th Cir. 2007); *see also Olin v. Demings*, 2014 WL 117081, *4 (M.D.Fla. 2014). The jury was free to reject Mr. de Armas' and Mr. Cunningham's opinions, especially when the undisputed evidence established that nothing was done to determine a reasonable amount for the agreement, except to simply pick a number.

Based on the foregoing testimony, GEICO clearly established, among other things, that: 1) the underlying action against JIMENEZ by the Estate of Pinedo was never even served on JIMENEZ; 2) no discovery was ever conducted in that case; 3) neither JIMENEZ and his attorneys, nor the Estate of Pinedo and its attorney, ever inquired into Pinedo's finances, other than the contents of one savings account; 4)

41

JIMENEZ agreed to the amount of $1,000,000.00, but did nothing to determine if the amount was reasonable based on the facts and his potential liability to the Estate of Pinedo; 5) JIMENEZ entered into the Agreement so that he would never be liable for the amount of damage that he caused to the Estate of Pinedo; and 6) the parties' attorneys contracted for attorney's fees and costs over and above the amount recoverable by Florida Statute § 627.428. [*See* Docs. 142-1 and 142-2; Defense Trial Exhibit 11.]

JIMENEZ suggests that simply because Mr. Pinedo passed away and had a young son, a $1,000,000 settlement value is automatically reasonable. This is not the law, and not the basis for determining reasonableness. Instead, this is evidence of bad faith, fraud collusion and no effort by the parties to minimize liability. Federal courts have found that a negotiated settlement ". . . becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant. Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer." *Continental Cas. Co. v. Hempel*, 4 Fed.Appx. 703, 716 (10th Cir. 2001); *see also Sargent v. Johnson,* 551 F.2d 221, 232 (8th Cir.1977). "In this context, 'collusion' and 'fraud' are often

defined broadly and 'are not necessarily tantamount to the tort of fraud in that there need not be a misrepresentation of a material fact.'" *Hempel*, 4 Fed.App. at 717.

Here, the evidence showed that Mr. Nation, the attorney litigating the bad faith action that forms the basis for the present appeal, drafted the *Coblentz* Agreement, specifically awarding attorneys' fees to himself over and above those provided for by Florida Statute § 627.428, and requiring him to be the attorney in the bad faith action. As explained above, JIMENEZ was required to cooperate in the litigation of a bad faith action, and was relieved from all liability if he participated. These terms are not required in a *Coblentz* Agreement, and are evidence of collusiveness and bad faith. An agreement that is entered into at arm's-length between two adversaries may be found to be in good faith. However, when two adversaries who are not actually adversarial enter into an agreement in which they will share fees, that is evidence of collusion. Thus, based on the evidence presented at trial, there was ample evidence upon which the jury could rely in concluding that the *Coblentz* Agreement was tainted by bad faith, fraud, or collusion or without any effort to minimize liability.

As recognized by this Court, for an insured / claimant to prevail on a claim for recovery pursuant to a *Coblentz* agreement, the issues of reasonableness and whether the agreement was entered into in good faith must **both** be resolved in the insured's / claimant's favor. *See American Pride Building Co., LLC*, 534 F.App'x at 928;

43

*Chomat*, 919 So.2d. at 537 ("Where an injured party wishes to recover under a *Coblentz* agreement, 'the injured party must bring an action against the insurer and prove coverage, wrongful refusal to defend, and that the settlement was reasonable **and** made in good faith.'")(emphasis added).  In other words, in Florida, it is an all or nothing proposition. *See id*. A consent judgment will only be enforced against the insurer if both elements are met.  *See  Quintana v. Barad*, 528 So.2d 1300, 1301 n. 1 (Fla. 3d DCA 1988).  If an insurer can prove that either element is unsatisfied, the consent judgment cannot be enforced. *See Steil*, 448 So.2d 589. Because there was sufficient evidence presented at trial to establish that the *Coblentz* Agreement was unreasonable in amount and that it was tainted by bad faith, fraud, or collusion or without any effort to minimize liability, the district court properly denied JIMENEZ's Motion for Judgment as a Matter of Law.  GEICO respectfully requests that this Court decline to disturb that finding.

## III.    JIMENEZ has failed to establish that the trial court abused its discretion in denying his Motion for New Trial.

Following the jury's verdict and the district court's judgment in GEICO's favor, JIMENEZ requested that the trial court grant him a new trial, arguing that ". . . if a jury delivers a verdict based upon several possible grounds –that is, it is impossible to tell which ground(s) formed the basis for the verdict – and any one of those grounds was not supported by the evidence or was improperly submitted to the

jury, the verdict must be overturned." [Doc. 138 at p. 17.]  JIMENEZ relied upon

substantially the same case law to support his Motion for New Trial as he relies upon

on appeal.  *See Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994);

*see also Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co., a div. of Paccar,*

*Inc.*, 781 F.2d 1520, 1528-1529 (11th Cir. 1986); *see also Royal Typewriter Co., a*

*Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1099

(11th Cir. 1983).  While JIMENEZ framed his argument in terms of the "two-issue

rule" in his post-trial motion, he argues on appeal that the jury was asked a confusing

and compound interrogatory, which combined an improper and a proper question.

[*See* JIMENEZ's Initial Brief at p. 39.]

Presumably, JIMENEZ attempted to repackage his argument in an effort to

obtain a more favorable ruling than that rendered by the district court, which

commented that his argument was "not well-taken." [Doc. 145 at p. 8.]  The trial

judge acted well within his discretion when he declined to grant a new trial based on

JIMENEZ's complaints about a jury question that this Court has specifically

approved.  [*See id*. (*citing Mid-Continent Cas. Co.*, 534 Fed.Appx. at 928).]  In its

Order denying JIMENEZ's Motion for New Trial, the district court explained as

follows:

> The Eleventh Circuit has specifically found that question
> two of the verdict form – "Do you find the consent

45

> judgment entered into by [Antonio James Jimenez] was reasonable in amount *and* not tainted by bad faith, fraud, collusion or without any effort to minimize liability?" – is an accurate statement of Florida law and has upheld the use of the question as a *special* verdict form interrogatory.

[*Id*. (emphasis in original).] Finding that the "two-issue rule" does not apply because the question is a special interrogatory, rather than a general verdict question, and that the special interrogatory question has specifically been approved by this Court for use in bad faith claims involving *Coblentz* agreements, the trial court denied JIMENEZ's Motion for New Trial. [*See id*. at pp. 8-9.]

The district court was correct in stating that this Court has specifically approved use of the exact special verdict interrogatory used in this case, as it represents an accurate statement of Florida law. *Mid-Continent Cas. Co.*, 534 F. App'x at 927-928. For this reason alone, JIMENEZ's arguments are without merit.[9] In *Mid-Continent*, the jury answered "no" when asked whether the settlement "was reasonable in amount and not tainted by bad faith, fraud, collusion or without any effort to minimize liability" and the district court entered judgment in favor of the insurer, finding the consent judgment unenforceable under Florida law. *Id*. The

---

[9] JIMENEZ argues that the wording of the jury question was not ". . . a feature of the [*Mid-Continent*] appeal at all." [JIMENEZ's Initial Brief at p. 37 n. 11.] This interpretation of *Mid-Continent* is not at all consistent with the opinion, in which this Court focused almost exclusively on whether the jury question was a proper statement of Florida law.

Eleventh Circuit noted, upon review of the special verdict interrogatory, that Florida law could not be clearer as to the elements necessary to enforce a consent judgment – coverage, wrongful refusal to defend, and that the settlement was reasonable **and** made in good faith. *See Quintana*, 528 So.2d at1301 n. 1. The Court further stated that whether addressing what an insurer must prove to prevent enforcement of a consent judgment—an unreasonable amount *or* bad faith—or what an insured must prove to enforce a consent judgment—a reasonable amount *and* the absence of bad faith—the district court's jury instructions and verdict form accurately reflected Florida law. The Court pointed out that, in Florida, it is an all or nothing proposition and a consent judgment will only be enforced if both elements are met. *See id.*; *see also Quintana*, 528 So.2d 1300. If an insurer can prove that either element is unsatisfied, the consent judgment cannot be enforced. *See id*; *see also Steil*, 448 So.2d at 592 ("Thus, we hold that in a case such as this, a settlement may not be enforced against the carrier if it is unreasonable in amount *or* tainted by bad faith.")(emphasis added). In short, the Eleventh Circuit has approved use of the special verdict form interrogatory which was presented to the jury as question two in this case, and the district court cannot be found to have abused its discretion by ruling in line with *Mid-Continent*.

According to JIMENEZ, the "terribly drafted" question ". . . bundled GEICO's

47

two defenses into a single question." [JIMENEZ's Initial Brief at pp. 36-37.] JIMENEZ attempts to create confusion and ambiguity regarding a straight-forward question (which has already been approved by this Court) by inviting the Court to dissect the grammar of the sentence. However, the jury was not asked to diagram the question, but to answer it, which the jury did in the negative. In fact, when presenting his closing argument to the jury, JIMENEZ's counsel, Mr. Nation, acknowledged the simplicity of the verdict form, stating as follows: "The way I'd like to start is to work through the verdict form – it's not very complicated – and show you that." [Doc. 134 at p. 2.] Mr. Nation's closing argument also contradicts JIMENEZ's argument that the jury may not have known whether they were finding for GEICO or JIMENEZ by answering "no" to question number two. [*See* JIMENEZ's Initial Brief at p. 38 (stating that the last part of question two ". . . might be seen as a triple negative making it confusing as to which answer is the correct one if the jury meant to reject GEICO's defenses.").] JIMENEZ's counsel explained to the jury that if they answered no to the second question, JIMENEZ would lose, and requested that the jury return a "yes" response. [*See* Doc. 134 at p. 3.] Mr. Nation repeated this thought on rebuttal, leaving the jury with the statement that ". . . the answer is yes on two." [Doc. 134 at p. 54.] Therefore, this Court should reject JIMENEZ's argument on appeal that question number two confused the jury about the party for whom it was

returning a verdict.

Moreover, JIMENEZ does not argue that the second jury question included elements that were unsupported by Florida law, but, instead, acknowledges that the elements set forth in question number two ". . . could potentially support a finding of a bad-faith Coblentz agreement," and argues that they should have been explained in the jury instructions, rather than included on the verdict form. [*See* JIMENEZ's Initial Brief at p. 38.] Even if this Court were to agree, this in no way rises to the level of abuse of discretion by the trial court.

JIMENEZ's argument on appeal that question number two was an improper compound question relies on this Court finding that ". . . there is no colorable argument that the Coblentz agreement was in bad faith." [*Id*. at p. 36.] Proving this statement is the only way that JIMENEZ could possibly convince this Court that the second jury question impermissibly combined an improper question with a proper one – the improper question being whether the Agreement was entered into in bad faith. However, as explained in the preceding section of this Answer Brief, evidence was presented at trial on which the jury could rely in finding that the *Coblentz* Agreement was entered into in bad faith. It was undisputed that JIMENEZ and the Estate of Pinedo engaged in **no** discovery before entering into the *Coblentz* Agreement. Therefore, rather than negotiating a settlement amount that objectively reflected the

true value of the Pinedo claim, the parties to the Agreement simply plucked a number out of thin air. Furthermore, the jury was informed that the attorneys representing the parties to the *Coblentz* Agreement would recover fees from the settlement amount if the Agreement was later enforced against the insurer. The jury could very easily have relied on this evidence, as well as the remainder of the evidence explained at length in the previous section of this Answer Brief, and found that the *Coblentz* Agreement was entered into in bad faith.

Because the jury was properly asked to determine whether the *Coblentz* Agreement was entered into in bad faith, *Richards*, the primary case relied upon by JIMENEZ, does not apply to the present matter. *See Richards*, 21 F.3d at 1055. *Crist* is also inapplicable because it involved a general verdict form, rather than a special verdict. *See Crist v. Dickson Welding, Inc.*, 957 F.2d 1281, 1286 (5th Cir. 1992). As explained by the trial court in its Order denying JIMENEZ's Motion for New Trial, the "two-issue rule" states that "an appellate court will not grant a new trial where the jury has rendered a general verdict and the appellate court finds no error as to one of the theories on which the jury was instructed." [Doc. 145 at p. 8.] In the present matter, the jury was not presented with a general verdict, but a question that this Court has specifically determined is a proper special interrogatory.

## CONCLUSION

GEICO respectfully requests that this Honorable Court affirm the trial court's denial of JIMENEZ's Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial. [*See* Docs. 138, 145.]  Contrary to JIMENEZ's assertions, there was sufficient evidence for the jury to find that the *Coblentz* Agreement was not reasonable in amount or that it was entered into as a result of bad faith, fraud, or collusion or without any effort to minimize liability.  Furthermore, JIMENEZ failed to establish on appeal that the district court abused its discretion in declining to order a new trial based on the construction of question number two on the jury verdict form.  Rather, the trial judge relied on case law from this Court which specifically upheld use of the exact language presented to the jury in this case.  Therefore, this Court should affirm on all points.

Respectfully submitted this 20th day of October, 2015.

**s/ MEGAN M. HALL**
**B. RICHARD YOUNG**
Florida Bar No.: 442682
ryoung@flalawyer.net
**MEGAN M.  HALL**
Florida Bar No.: 41695
mhall@flalawyer.net
Young, Bill, Boles, Palmer & Duke, P.A.
P.O. Drawer 1070
Pensacola, FL 32591-1070
(850) 432-2222  / 432-1444 - facsimile
Attorneys for GOVERNMENT
EMPLOYEES INSURANCE COMPANY

51

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 12159 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

**s/ MEGAN M. HALL**
**B. RICHARD YOUNG**
Florida Bar No.: 442682
ryoung@flalawyer.net
**MEGAN M.  HALL**
Florida Bar No.: 41695
mhall@flalawyer.net
Young, Bill, Boles, Palmer & Duke, P.A.
P.O. Drawer 1070
Pensacola, FL 32591-1070
(850) 432-2222  / 432-1444 - facsimile
Attorneys for GOVERNMENT EMPLOYEES INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2015, a true and correct copy

of the foregoing document has been filed via this Court's Electronic Case Files (ECF)

system; and a copy served this day on all counsel of record or pro se parties identified

on the attached Service List in the manner specified, either via transmission of

Notices of Electronic Filing generated by this Court's ECF, or in some other

authorized manner for those counsel or parties who are not authorized to receive

Notices of Electronic Filing.

**s/ MEGAN M. HALL**
**B. RICHARD YOUNG**
Florida Bar No.: 442682
ryoung@flalawyer.net
**MEGAN M.  HALL**
Florida Bar No.: 41695
mhall@flalawyer.net
Young, Bill, Boles, Palmer & Duke, P.A.
P.O. Drawer 1070
Pensacola, FL 32591-1070
(850) 432-2222 / 432-1444 - facsimile
Attorneys for GOVERNMENT
EMPLOYEES INSURANCE COMPANY

53

**SERVICE LIST**

**Antonio James Jimenez v. Government Employees Insurance Company**
**CASE NO.: 15-12352-A**
**United States Court of Appeals for the Eleventh Circuit of Florida**


Mark A. Nation
mnation@nationlaw.com
Thomas K. Brown
tbrown@nationlaw.com
The Nation Law Firm
570 Crown Oak
Longwood, Florida 32750
Tel: (407) 339-1104
Fax: (407) 339-1118


Steven L. Brannock
sbrannock@BHappeals.com
Ceci Culpepper Berman
cberman@BHappeals.com
Thomas J. Seider
tseider@bhappeals.com
Brannock & Humphries
100 South Ashley Drive, Suite 1130
Tampa, Florida 33602
Tel: (813) 223-4300
Fax: (813) 262-0604
Counsel for Appellant